IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JAMES C. KAUER, | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| | : | No. 22-cv-2580 |
| | : | |
| KILOLO KIJAKAZI,[1] | : | |
| Acting Commissioner of | : | |
| Social Security. | : | |

**MEMORANDUM OPINION**

**CRAIG M. STRAW, U.S.M.J.**                                November 29, 2023

Plaintiff James C. Kauer ("Plaintiff" or "Kauer") seeks review of the Commissioner's decision denying his application for disability insurance benefits ("DIB"). The matter was referred to me[2] on consent of the parties.[3] Doc. 15. For the following reasons, I deny Kauer's request for review, and affirm the Commissioner's decision.

## I.     FACTUAL AND PROCEDURAL BACKGROUND

Kauer is college educated, earning his bachelor's degree and taking retirement classes in computer engineering at the University of Delaware. R. 26; 30; 45; 95. Kauer's previous job titles included: quality control, customer service agent, plant operator, project manager, production supervisor, janitor, and order processor. R. 45-51.

---

[1] Pursuant to Fed. R. Civ. P. 25(d) and 42 U.S.C. § 405(g), Kijakazi was automatically substituted into cases brought against the Commissioner upon her temporary appointment.
[2] I was reassigned the case from Magistrate Judge David R. Strawbridge on July 28, 2023. Doc. 13.
[3] See 8 U.S.C. § 636(c); Fed. R. Civ. P. 73.

Kauer applied for DIB on January 10, 2019, alleging disability since September 15, 2017. R. 105.[4]  His application was denied on February 25, 2019.  R. 124-27.  Kauer filed a request for a hearing.  R. 128-29.  The ALJ held an in-person hearing on December 13, 2019.[5]  R. 39-67. A supplemental hearing was held on October 13, 2019, via teleconference due to COVID-19 pandemic restrictions.  R. 68-104.  At both hearings, Kauer was represented by counsel.  R. 39; 68.

On November 3, 2020, the ALJ issued a written decision finding that Kauer was not disabled and denied benefits.  R. 20-38.  On November 10, 2020, Kauer requested review of the ALJ's decision.  R. 260-62.  The Appeals Council denied Kauer's request for review.  Thus, the ALJ's decision became the final decision of the Commissioner of Social Security.  R. 9-14; 20 C.F.R. § 404.981.  Kauer then filed this action in federal court.  Doc. 1.

## II.   LEGAL STANDARDS

To qualify for DIB, a claimant "must demonstrate some medically determinable basis for an impairment that prevents him [or her] from engaging in any substantial gainful activity for a statutory twelve-month period."  Burnett v. Comm'r Soc. Sec., 220 F.3d 112, 118 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999) (internal quotation marks omitted)); 42 U.S.C. § 423(d)(1).

The Commissioner engages in a "five-step sequential evaluation process" to evaluate whether a claimant is disabled.  20 C.F.R. § 404.1520(a)(4).  This process considers:

---

[4] At Kauer's first hearing, his counsel amended the onset disability date to December 12, 2017, Kauer's fifty-fifth birthday, making him a person of advanced age under the regulations.  R. 43; 20 C.F.R. § 404.1563(e).  The ALJ acknowledged the amendment to the onset disability date in his decision and hypothetical to the vocational expert ("VE"), but used the original September 15, 2017 date in his findings of fact and conclusions of law.  R. 23; 25; 97.

[5] When the ALJ closed the hearing, he kept the record open for SSA psychiatric and internal consultative examinations, which were later accepted as part of the record.  R. 66.

1.  Whether the claimant is currently engaged in substantial gainful activity;
2.  If not, whether the claimant has a "severe impairment" that significantly limits their physical or mental ability to perform basic work activities;
3.  If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings" see 20 C.F.R. pt. 404, subpt. P, app. 1), which results in a presumption of disability;
4.  If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform their past work; and
5.  If the claimant cannot perform their past work, whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 611 (3d Cir. 2014); 20 C.F.R. § 404.1520(a)(4). The claimant bears the burden of proof at steps one through four, while the burden shifts to the Commissioner at the fifth step to establish that the claimant can perform other jobs in the local and national economies, in light of his or her age, education, work experience, and RFC. See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007) (citation omitted).

The court's role on review is to determine whether the Commissioner's decision is supported by substantial evidence. Poulos, 474 F.3d at 91; Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999) (citing 42 U.S.C. § 405(g)). Substantial evidence is not "a large or considerable amount of evidence, but rather such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Pierce v. Underwood, 487 U.S. 552, 565 (1988) (internal quotation marks omitted). It is "more than a mere scintilla" of evidence but may amount to less than an evidentiary preponderance. Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001) (citing Plummer, 186 F.3d at 427); Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988) (citing Stunkard v. Sec'y of Health & Human Servs., 841 F.2d 57, 59 (3d Cir. 1988)). It is

a deferential standard of review.  See Jones v. Barnhart, 364 F.3d 501, 503 (3d Cir. 2004) (citing Schaudeck, 181 F.3d at 431).

### III.    ALJ'S DECISION AND PLAINTIFF'S REQUEST FOR REVIEW

The ALJ determined Kauer had not engaged in substantial gainful employment from his alleged disability onset date of September 15, 2017 through his date last insured of December 31, 2017.  R. 25.  The ALJ found that Kauer suffered from the severe impairments of bipolar disorder and essential tremors.  R. 25; see also 20 C.F.R. § 404.1520(c).  The ALJ also assessed Kauer's medically determinable impairments finding that they significantly limited his ability to perform basic work activities.  R. 26.  The ALJ determined, however, that these impairments or combination of impairments did not meet or medically equal the severity of one of the listed impairments.  Id.; 20 C.F.R. pt. 404 subpt. P, app. 1; see also 20 C.F.R. §§ 404.1520(d), 404.1525, 404.1526.

Considering the full record, including Kauer's testimony, medical evidence, and nonmedical evidence, the ALJ found that Kauer had the RFC to perform medium work as defined in 20 C.F.R. § 404.1567(c), except that he is restricted to simple, routine tasks with few workplace changes and no interaction with the general public.  R. 27.  Kauer was also limited to frequent fine manipulations with either hand.  Id.

Relying on the testimony of VE Katherine A. Young, the ALJ decided that Kauer was unable to perform any past relevant work.  R. 31; 97-98; see also 20 C.F.R. §§ 404.1569, 404.1569(a).  However, considering Kauer's age, education, work experience, RFC, and the VE's testimony, a significant number of jobs exist in the national economy that Kauer can perform, including bed frame assembler, industrial cleaner, and machine packager.  R. 32; 97-99. Therefore, the ALJ determined that Kauer was not disabled.  R. 32.

In his request for review, Kauer raises four issues.  First, Kauer argues that the ALJ improperly discredited Plaintiff's testimony about the severity of his symptoms.  Doc. 10, at 4. Second, Kauer contends that the ALJ found Dr. Saul's opinion unpersuasive for erroneous reasons.  Id. at 14.  Third, Kauer asserts the ALJ failed to assess the consistency of Plaintiff's wife's testimony and explain why he rejected her testimony.  Id. at 28.  Finally, Kauer argues that the ALJ failed to include all of Plaintiff's credibly established limitations in his RFC and hypothetical questions to the VE.  Id. at 29.  The Commissioner argues that substantial evidence supports the ALJ's evaluation of the medical opinions, Kauer's subjective symptoms, and Kauer's wife's testimony.  Doc. 11, at 6-20.  Moreover, the Commissioner argues that substantial evidence supports the ALJ's RFC assessment and hypothetical questions to the VE.  Doc. 11, at 19-20.

## IV.   FACTUAL BACKGROUND

Before addressing Kauer's claims, I discuss the medical opinions, evidence in the record, and additional information pertinent to his claims.[6]

### A.  Medical Evidence[7]

#### a.  Dr. Saul's Opinion

Dr. Saul is Kauer's primary psychiatrist and has treated his bipolar disorder for twenty-two years.  R. 43-44; 54; 834.  Dr. Saul provided a Medical Source Statement of Ability to do Work-Related Activities (Mental) ("MSS") and Treatment Source Addendum relating to Kauer's

---

[6] The medical record subject to this opinion contains duplicate documents.  For the sake of efficiency, the Court cites to one set of records only.

[7] The medical opinions of Dr. Lee Saltzgaber (internal medicine consultant), Dr. Steven M. Ginsburg (Kauer's family medicine physician), and Mr. Drew Alikakos (the psychologist who Kauer saw in 2019) are not discussed in this opinion as they have no bearing on the claims raised.

bipolar disorder and treatment history.  R. 395; 834.  In Dr. Saul's Treatment Source Addendum, she opined that Kauer's mental health symptoms and functional restrictions worsened after he was laid off in 2017.  R. 834.  She stated that Kauer's flat affect, slowed down actions, and motivational issues have prevented him from obtaining and keeping employment.  Id.

In Dr. Saul's MSS completed on November 7, 2019, she noted that Kauer showed extreme limitation in the following categories: ability to understand and remember instructions/information, ability to carry out and apply instructions/information, and ability to make judgment on simple work-related decisions.  R. 395.  Dr. Saul described Kauer's challenges as "problems thinking in a direct way," "slowed down responses," and "unmotivated but tries to answer questions."  Id.  She further found that Kauer had extreme limitations related to his ability to respond appropriately to supervision, co-workers and work pressures in a work setting.  R. 396.  Dr. Saul reported that Kauer seems distracted and unmotivated to work.  Id.  She opined that Kauer has experienced extreme limitations since 2003.  R. 397.  She noted that Kauer is "off task" 25% (or more) of the time.  R. 396.  Although she noted that Kauer's impairments would affect his work attendance, she did not anticipate him being absent more than once a week.  R. 397.  Kauer was taking medication to treat his bipolar disorder.  Id.  Dr. Saul noted slowness as a side effect of Kauer's medication, but she did not mention tremors during her evaluation.  Id.

Throughout Dr. Saul's treatment records from January 2008 to November 2019, she generally noted that Kauer's mood was stable on medication, he had no outbursts or hospitalizations, and that he struggled with maintaining a job but was employed for various periods of time.  R. 393-434.  Significantly, Dr. Saul noted an uptick in depressive symptoms and anxiety at the beginning of 2019, during this time she observed general slowness in thought

6

and confusion.  R. 432-35.  In late 2019, Dr. Saul noted Kauer was hearing voices, became paranoid, and expressed thoughts of conspiracy.  R. 830-32.  On June 12, 2020, Kauer admitted that he had been hearing voices for years and that the voices distract him and "may affect his presentation at work."  R. 874.

### b.  Dr. Patrone's Opinion

The Pennsylvania Department of Labor and Industry referred Kauer to Dr. Patrone for a clinical psychological disability evaluation for his bipolar disorder on January 27, 2023.[8]  R. 867. Dr. Patrone considered Kauer's reported oral and written past medical history, chronic medical conditions, and current mental state during the evaluation.[9]  R. 853-69.  Dr. Patrone's evaluation was conducted with self-reported information from Kauer because Kauer did not provide any medical records for Dr. Patrone to review.  R. 853.  Dr. Patrone opined that Kauer's manner of relating, social skills, and overall presentation were adequate.  R. 855.  He only noted poor insight and fair judgement as issues.  R. 855-56.

Dr. Patrone also completed a (Mental) MSS .  R. 858-60.  Dr. Patrone found that Kauer's bipolar disorder, while managed with medication, did not affect his ability to understand, remember, and carry out instructions.  R. 858.  Kauer's impairment, however, affected his ability to interact appropriately with supervisors, co-workers, and the public, as well as respond to changes in routine work settings.  R. 859.  Dr. Patrone found that Kauer was moderately impaired in his ability to interact appropriately with the public, his supervisors, and his co-workers.  Id.  Dr. Patrone found marked impairment in Kauer's ability to respond to usual work

---

[8] The Pennsylvania Bureau of Disability Determination is a subdivision of the Pennsylvania Department of Labor & Industry used to assist the Social Security Administration in determining disability.  https://www.dli.pa.gov/Individuals/Disability-Services/bdd/Pages/default.aspx

[9] Dr. Patrone noted that Kauer had a reported medical history of psychiatric hospitalizations for his bipolar disorder in 1985, 1987, 1989, and 1999.  R. 854.

situations and changes in a routine work setting.  Id.  Dr. Patrone based his conclusions on Kauer's bipolar disorder remission status as controlled with his current medication and his reported behaviors without medication.  Id.  Lastly, Dr. Patrone also stated that, based on Kauer's history of irrational and bizarre behavior, his impairment affected his ability to concentrate, persist, and/or maintain pace.  Id.

### B. Nonmedical Evidence

#### a. Kauer's Testimony

Kauer's bipolar disorder began in 1985.  R. 56.  Kauer becomes manic when not medicated.  R. 58.  As a result of his bipolar disorder, Kauer said he is telepathic, can hear voices in his mind, can hear what people are thinking, can sometimes see into the future, and can "predict things."  R. 56-57; 78.  The telepathy affects his concentration and communication with others.  R. 78-79; 85.  He also has trouble understanding others.  R. 55.  Kauer testified that he did not tell his doctors about the long-standing voices he heard because he was scared he was schizophrenic and would be hospitalized, or face bias if the diagnosis was in his records.  R. 81.  Kauer has managed his bipolar disorder with lithium carbonate and Zyprexa, which help reduce the voices he hears.  R. 54; 88-89.

Kauer also suffers from tremors that affect his writing and typing.  R. 54; 58-59.  His hand tremors started ten years ago, in approximately 2010.  R. 70; 77.  Kauer's tremors are not consistent, but flare during times of stress.  R. 82.  He described the flaring as occurring 2-3 times a week for approximately thirty minutes or until the stress fades.  R. 83.  Kauer equates the intensity of the tremors to operating a jack hammer.  Id.  His tremors worsened in 2017.  R. 77.  He is currently taking propranolol, as needed, for his tremors.  R. 87.

Kauer was employed at various companies, with periods of unemployment, from 2002 to 2017.  R. 45-51.  In 2017, Kauer worked at GlaxoSmithKline as a contractor selling vaccines.  R. 51.  His job included customer service interactions, ordering vaccines, working on a computer, and sitting at a desk.  Id.  Kauer testified that his bipolar disorder caused him to have trouble passing the tests on the newly released vaccines they were selling.  Id.  He reported memory issues but testified that his long-term and short-term memory were intact.  R. 59.  Further, Kauer reported that his tremors affected his ability to use the computer, which was required to order the vaccines.  R. 53.  Kauer was laid off in September 2017 after the company closed the division.  R. 51.  Since his lay off, Kauer has applied for jobs and has been invited to interview.  Id.  Kauer stated that his medication causes him to think, talk, and move slowly, which is why he believes he has not received any offers for employment.  R. 54-55; 84.

Kauer has trouble repairing items, or if a screw needs to be tightened Kauer reports that his hands shake making him unable to tighten the screw.  R. 78.  Despite his tremors, Kauer took two classes at the University of Delaware, Wilmington campus in 2017—one on Microsoft Word and one on how to physically repair a computer.  R. 95.

Kauer's daily routine includes having coffee, making the bed, getting dressed, checking emails and applying for jobs on the computer, and reading the newspaper.  R. 60.  Kauer performs household chores such as vacuuming, cleaning the bathroom, washing dishes, and shopping.  R. 61.  He also goes to the YMCA to lift weights.  R. 62.  Kauer can drive on his own and generally does the food shopping.  Id.  Kauer testified that his wife helps him with some of the chores because his tremors prevent him from doing them on his own.  R. 85.  He reported he can complete chores alone when there is no time constraint.  Id.

### b.  Susan Satterly's Testimony

Kauer's wife, Susan Satterly, testified at the second hearing on October 23, 2020.  R. 91.

Mrs. Satterly testified that Kauer's hands shake 90% of the time, regardless of stress level.  Id.

Additionally, his tremors worsen when he concentrates.  R. 92.  Mrs. Satterly testified that Kauer

can perform chores slowly, specifically chores that do not require quick speed.  Id.  Mrs. Satterly

noted Kauer has issues with concentration and memory.  R. 93.  She explained that Kauer

requires step-by-step instructions for tasks including very basic common-sense concepts.  Id.

She testified that when his job became stressful, Kauer would exhibit strange behaviors like

staring into the distance for extended periods of time.  R. 94.

V.    **ANALYSIS**

A.   **Substantial Evidence Supports the ALJ's Determination that Kauer's Testimony Regarding the Severity of His Symptoms Was Not Consistent with the Medical Record.**

Kauer asserts that the ALJ improperly rejected his testimony about the severity of his

symptoms when he found that Kauer's statements concerning the intensity, persistence and

limiting effects of his bipolar disorder, were not entirely consistent with the medical record and

other evidence.  Doc. 10, at 4.  Specifically, Kauer claims that the ALJ improperly discredited

his testimony based on the medical records indicating Kauer, "generally reported that his mood,

sleep, and appetite were good/stable."  Doc. 10, at 12.  Kauer further argues that the ALJ erred

by classifying his outpatient mental health treatment as "conservative."  Id.

Under Social Security Ruling 16-3p, the ALJ must follow a two-step process when

evaluating the plaintiff's subjective symptoms.  SSR 16-3p, 2016 SSR LEXIS 4, at *3-4 (March

16, 2016).  First, the ALJ must determine if there is an underlying medically determinable

physical or mental impairment, shown by medically acceptable clinical and laboratory diagnostic

techniques, that could reasonably be expected to produce the plaintiff's pain or symptoms.  Id. at

*3.  Next, the ALJ must evaluate the intensity, persistence, and limiting effects of the symptoms

10

to determine the extent to which they limit the plaintiff's functioning.  Id. at *4.  In evaluating

the intensity, persistence, and limiting effects of a claimant's symptoms, the ALJ must consider

relevant factors such as the objective medical evidence, evidence from medical sources,

treatment course and effectiveness, daily activities, and consistency of the plaintiff's statements

with the other evidence of record.  Id.

     "It is well-established that an ALJ is required to 'give serious consideration to a

claimant's subjective complaints of pain [or other symptoms], even where those complaints are

not supported by objective evidence.'"  Mason v. Shalala, 994 F.2d 1058, 1067 (3d Cir. 1993)

(citing Ferguson v. Schweiker, 765 F.2d 31, 37 (3d Cir. 1985)).  Nevertheless, a claimant's own

statements about pain or other symptoms are not sufficient, by themselves, to establish that he or

she is disabled.  20 C.F.R. § 404.1529(a).  Thus, an ALJ may discount subjective complaints if

they are inconsistent with the objective medical evidence.  Id.; see also Weber v. Massanari, 156

F. Supp. 2d 475, 485 (E.D. Pa. 2001) (explaining an ALJ "has the right, as the fact finder, to

reject partially, or even entirely" subjective complaints if they are not fully credible).  An ALJ

may find a claimant's testimony less than credible due to inconsistencies in the testimony itself

and compared to the medical evidence.  See Garrett v. Comm'r of Soc. Sec., 274 F. App'x 159,

164 (3d Cir. 2008) (citing Burns v. Barnhart, 312 F.3d 113, 129–30 (3d Cir. 2002))

("Inconsistencies in a claimant's testimony or daily activities permit an ALJ to conclude that

some or all of the claimant's testimony about her limitations or symptoms is less than fully

credible.").  On the other hand, "a[n] ALJ must give great weight to a claimant's subjective

testimony . . . when this testimony is supported by competent medical evidence."  Schaudeck,

181 F.3d at 433.  An ALJ's conclusion is entitled to great deference since he or she is the one

who has seen the hearing up close.  Biestek v. Berryhill, 139 S. Ct. 1148, 1157 (2019).  The

conclusion will be upheld so long as substantial evidence supports it.  See Horodenski v.

Comm'r of Soc. Sec., 215 F. App'x 183, 189 (3d Cir. 2007).

When finding Kauer's subjective statements regarding his symptoms were not completely

consistent with the evidence, the ALJ stated in relevant part:

> The claimant alleges disability due to tremors that he claims cause his hands
> to shake as if he was operating a jackhammer.  According to the claimant, his
> tremors limit his abilities to type and use his hands.  He also alleges that he
> suffers from bipolar disorder and mania.  He claims that he hears voices, he
> can read minds, and he can predict the future.  He also reports confusion,
> memory loss, difficulty concentrating, lack of understanding, difficulty
> following instructions, and difficulty getting along with others....
>
> After careful consideration of the evidence, the undersigned finds that the
> claimant's medically determinable impairments could reasonably be expected
> to cause the alleged symptoms; however, the claimant's statements concerning
> the intensity, persistence and limiting effects of these symptoms are not
> entirely consistent with the medical evidence and other evidence in the record
> for the reasons explained in this decision.

R. 28 (citations omitted).

After considering Kauer's testimony, the ALJ compared his testimony to the medical

records and found that Kauer's statements regarding the severity of his symptoms were

unsubstantiated.

The ALJ relied on both medical and nonmedical evidence to support his conclusion that

the reported severity of Kauer's hand tremors was inconsistent with the objective medical

records.  Id.  The ALJ specifically noted:

> The evidence regarding the claimant's tremors is scarce prior to the
> date last insured of December 31, 2017.  Remote treatment records
> dating back to 2010 make no reference to tremors prior to his date
> last insured.
>
> On January 30, 2017, the claimant presented for a comprehensive
> review/physical exam.  He reportedly was "doing okay" and
> walking for exercise.  He reported no neurologic symptoms and

physical examination results were normal with no mention of tremors.

Psychiatric treatment records from 2017 make no reference to tremors.  A psychiatric treatment record dated January 11, 2018 notes that the claimant "had a touch of tremor on interview." **While this treatment record is from shortly after the date last insured, the undersigned gives the claimant the benefit of the doubt and finds that the claimant had a severe impairment of a tremor disorder prior to December 31, 2017.**

Nevertheless, the medical evidence does not establish that the claimant had tremors that were as severe as alleged prior to the date last insured.  Rather, the claimant's family practice treatment records indicate that he was not diagnosed with benign essential tremor until February 4, 2019.  That was when he was prescribed propranolol for tremors.

In addition, non-medical evidence indicates that the claimant's tremors were not a significant problem prior to the date last insured. Notably, the claimant was working up until September 2017, and he only stopped because he was laid off.  There is no evidence that his job performance was unsatisfactory up until that point due to tremors or any other medical impairment.  As of January of 2017, he reported that he was relatively healthy and his job was going okay. The record does not document any decline in functioning between then and December 31, 2017.  After he was laid off, the claimant was looking for work and sending out resumes.  This suggests that the claimant did not regard his tremors or any other impairment as a significant obstacle to work.

Finally, according to a treatment record dated October 12, 2017, the claimant was taking classes.  At the hearing, he explained that he took classes for about three to four months at the University of Delaware in Wilmington studying Microsoft Word and computer repair.  These would obviously entail significant manipulative abilities, which he apparently did not find were precluded by tremors.

R. 28-29 (emphasis added) (citations omitted).

Regarding Kauer's bipolar disorder, the ALJ considered the evidence and determined:

He also alleges that he suffers from bipolar disorder and mania.  He claims that he hears voices, he can read minds, and he can predict

the future. He also reports confusion, memory loss, difficulty concentrating, lack of understanding, difficulty following instructions, and difficulty getting along with others.

***

As for his bipolar disorder, the claimant reports bizarre beliefs, irritability, and social withdrawal. He also reports confusion, memory loss, difficulty concentrating, lack of understanding, difficulty following instructions, and difficulty getting along with others. **To account for these symptoms, the claimant is limited to simple, routine tasks with few workplace changes and no interaction with the public....**

Treatment records from 2017 document conservative outpatient mental health treatment. He saw a psychiatrist every three months for medication management and he received refills for Zyprexa and Lithium. According to treatment records, he continued to work, and he did not report that his symptoms caused a problem at work. He generally reported that his mood, sleep, and appetite were good/stable. According to family medicine treatment records from 2017, the claimant's mood and affect were normal. This evidence does not indicate that the claimant's symptoms precluded simple, routine tasks performed in a stable work environment with limited social demands.

Subsequent evidence does not suggest that the claimant's symptoms were as severe as alleged. As of February of 2019, his bipolar disorder was "very stable". According to a consultative examination in January of 2020, the claimant cleans, does laundry, and shops. His hobbies also include sail boating, listening to the radio, and reading. This does not indicate disabling deficits in concentration or focus.

R. 28 (emphasis added) (citations omitted).

The objective medical evidence in the record generally demonstrates that Kauer's bipolar disorder was well-managed with medication. R. 398-423; 687-90. The evidence includes periods of employment and self-reported stability and good mood. Id. The ALJ explained why Kauer's testimony was not supported by citing to multiple sources in the record. The ALJ cited to Kauer's reported daily living activities which included cleaning, laundry, and shopping. R.

29.  Importantly, the ALJ noted that there was no evidence that Kauer's job performance was unsatisfactory throughout his substantial work history until 2017 when he was laid off.  Id.  The ALJ noted there was a lack of documented decline in function in Kauer's medical record.  Id.  The ALJ supported his reasoning for discounting Kauer's reported symptom severity with evidence in the record.  See Stamm v. Kijakazi, 577 F. Supp. 3d 358, 374-75 (M.D. Pa. 2001) (citation omitted) (holding, in part, that ALJ fulfilled duty to consider claimant's symptoms by weighing them against entire medical record when ALJ discussed symptoms, daily living activities, and medical evidence and opinions).  Substantial evidence in the record supports the ALJ's conclusion that Kauer's symptoms were not as severe as he alleged.

Kauer additionally asserts that the ALJ erred by discounting the severity of his bipolar disorder based on his conservative outpatient mental health treatment.  Doc. 10, at 12.  As previously explained, the ALJ did not discount Kauer's testimony solely on the basis of his "conservative treatment."  The ALJ also considered Kauer's work history, daily living activities, testimony, and schooling.  R. 28-29.  The ALJ appropriately deemed Kauer's treatment conservative, noting that Kauer saw his psychiatrist once every three months for medication management of his Zyprexa and lithium.  Evidence in the record shows the medication was effective in allowing Kauer to work, report good/stable mood, and present with a normal affect.  R. 29.  See Myers v. Comm'r of Soc. Sec., 684 F. App'x 186, 191 (3d Cir. 2017) (holding ALJ did not err in determining that claimant's outpatient therapy and improvement with medication compliance was conservative treatment).

Notably, while the ALJ did not find Kauer's testimony consistent with the medical documentation in the record, the ALJ still found that Kauer suffered severe impairments of tremor disorder and bipolar disorder and accounted for these impairments by imposing

limitations on his interactions with individuals in the workplace.  R. 25; 28.  Thus, Kauer's

argument that the ALJ improperly ignored Kauer's testimony has no merit.

As substantial evidence supports the ALJ's finding that Kauer's testimony about the

severity of his impairments was inconsistent with the objective medical evidence, Kauer's first

claim fails.

### B.  Substantial Evidence Supports the ALJ's Decision Finding Dr. Saul's Opinion Unpersuasive.

Kauer argues that the ALJ erred in discrediting Dr. Saul's opinion.  Doc. 10, at 14; 16.

Kauer claims that the ALJ erred when he concluded that Dr. Saul's opinion was not supported by

her treatment notes and was inconsistent with medical and nonmedical evidence.  Doc. 10, at 18-

19.  Kauer also claims that the ALJ erred when he failed to consider Dr. Saul's explanations in

support of her opinion.  Id.  Relatedly, Kauer asserts that the ALJ erroneously considered Dr.

Saul's mental status examinations exclusively and substituted his lay witness opinion of Dr.

Saul's treatment notes when evaluating the persuasiveness of Dr. Saul's opinion.  Id. at 21.

When considering a medical opinion, the ALJ is not required to give "specific evidentiary

weight, including controlling weight" to any one opinion.[10]  20 C.F.R. § 404.1520c(a).  Instead,

the ALJ must evaluate the persuasiveness of the opinion based on five factors set forth in 20

C.F.R. § 404.1520c(c).  Thomas v. Kijakazi, No. 21-cv-3547, 2022 U.S. Dist. LEXIS 230246, at

*18 (E.D. Pa. Dec. 22, 2022); see also Lawrence v. Comm'r of Soc. Sec., No. 21-cv-01239, 2022

---

[10] The Commissioner made "sweeping changes" to the rules regarding the evaluation of medical
opinion evidence that became effective on March 27, 2017.  Lepperd v. Berryhill, No. 16-02501,
2018 U.S. Dist. LEXIS 55864, at *6 n.10 (M.D. Pa. Feb 20, 2018) (citing Revisions to Rules
Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844-01 (Jan. 18, 2017)), report
and recommendation adopted, Mar. 30, 2018.  Those changes abandoned the treating-physician
rule.  See 20 C.F.R. § 404.1520c.  Because Kauer filed his application for DIB after March 27,
2017, the medical opinions in the record will be evaluated according to the changed rules.

U.S. Dist. LEXIS 210886, at *7 (M.D. Pa. Nov. 21, 2022) (alteration in original) ("Rather than assigning weight to medical opinions, [an ALJ] will articulate 'how persuasive' he or she finds the medical opinions.").  The following factors for all medical opinions are: (1) supportability; (2) consistency; (3) relationship with the claimant, including the length of the treating relationship; (4) the medical source's specialization; and (5) other factors including but not limited to the source's familiarity with other evidence in a claim or with the disability program's policy and evidentiary requirements.  20 C.F.R. § 404.1520c(c).

The ALJ is only required to explain the supportability and consistency factors.  20 C.F.R. § 404.1520c(b)(2).  The ALJ need not discuss the other factors in the decision.  Id. Supportability means "the extent to which the medical source's opinion is supported by relevant objective medical evidence and explanations presented by the medical source."  Cota v. Kijakazi, No. 21-cv-672, 2022 U.S. Dist. LEXIS 153505, at *14-15 (M.D. Pa. Aug. 25, 2022); 20 C.F.R. § 404.1520c(c)(1).  As to supportability, "[t]he more relevant the objective medical evidence and supporting explanations presented by a medical source are to support his or her medical opinion(s) or prior administrative medical finding(s), the more persuasive the medical opinions or prior administrative medical finding(s) will be."  20 C.F.R. § 404.1520c(c)(1).  Consistency means "the extent to which the medical source's opinion is consistent with the record as a whole."  Cota, 2022 U.S. Dist. LEXIS 153505, at *15; 20 C.F.R. § 404.1520c(c)(2).  Regarding consistency, "[t]he more consistent a medical opinion(s) or prior administrative medical finding(s) is with the evidence from other medical sources and nonmedical sources in the claim, the more persuasive the medical opinion(s) or prior administrative medical finding(s) will be." 20 C.F.R. § 404.1520c(c)(2).

Even though the ALJ is not bound to accept any physician's conclusions, the ALJ "'may not reject them unless [he] first weighs them against other relevant evidence and explains why certain evidence has been accepted and why other evidence has been rejected.'"  Balthasar v. Kijakazi, No. 20-cv-06181, 2022 U.S. Dist. LEXIS 128441, at *16 (E.D. Pa. July 20, 2022) (quoting Cadillac v. Barnhart, 84 F. App'x 163, 168 (3d Cir. 2003) (additional quotation marks and citations omitted)); see also Densberger v. Saul, No. 20-cv-772, 2021 U.S. Dist. LEXIS 58926, at *25 (M.D. Pa. Mar. 29, 2021) ("[P]rovided that the decision is accompanied by an adequate, articulated reason, it is the province and duty of ALJ to choose which medical opinions and evidence deserve greater weight.").  When faced with conflicting opinion evidence, an ALJ has significant discretion in choosing whom to credit.  Brown v. Astrue, 649 F.3d 193, 196 (3d Cir. 2011) (citation omitted) ("[T]he ALJ is entitled to weigh all evidence in making its finding . . . [and] is not bound to accept the opinion or theory of any medical expert, but may weigh the medical evidence and draw its own inferences.").  When faced with conflicting evidence, however, the ALJ "cannot reject evidence for no reason or for the wrong reason."  Mason, 994 F.2d at 1066; Plummer, 186 F.3d at 429 ("The ALJ must consider all the evidence and give some reason for discounting the evidence she rejects.").

Turning to Kauer's first claim that the ALJ erred when finding that the medical records and other evidence did not support Dr. Saul's opinion, the ALJ explained why he did not find Dr. Saul's opinion persuasive.  R. 30.  The decision provides:

> Marjorie Saul, MD, the claimant's psychiatrist, opined that the claimant has extreme limitations in understanding, remembering, and carrying out instructions/information, in making judgments, in interacting with others, in workplace adaptation, and in maintaining concentration, persistence, or pace.  This is not persuasive.  Dr. Saul provided this opinion on November 7, 2019, but she indicated that the proposed limitations applied from 2003 to the present.  This is contradicted by earnings records documenting that the claimant

18

performed substantial gainful activity between 2005 and 2010 and
again from 2016 to 2017.  Thus, the claimant could not have had
extreme work-preclusive limitations since 2003.  Furthermore, these
extreme limitations are not supported by Dr. Saul's treatment notes
or by other medical records pertaining to the relevant period.  Dr.
Saul's assessment is inconsistent with her treatment note from
January 12, 2017 indicating that the claimant was working and
visiting his parents, and he had good mood and appetite and okay
sleep. Her assessment contrasts with a note from April 13, 2017
showing the claimant had stable mood, normal appearance, okay
sleep, and okay appetite. On July 13, 2017, the claimant was
attending dog obedience class and was not depressed but had three
depressed days that month, possibly due to financial issues.
Moreover, Dr. Saul's opinion is contrary to her note from October
12, 2017 showing he had normal appearance, interviewed for a new
job, and was taking classes.

R. 29-30 (citations omitted).

Kauer's claim that the ALJ erred when he found Dr. Saul's opinion unsupported by the
medical record and failed to provide sufficient reasoning for his decision lacks merit.  Here, the
ALJ specifically addresses the supportability of Dr. Saul's opinion when he analyzed the
treatment records.  R. 29-30; see 20 C.F.R. § 404.1520c(c)(1).  Dr. Saul's treatment records
reflect that Kauer's bipolar disorder symptoms were well-managed by medication.  R. 398-423;
687-90; see 20 C.F.R. § 404.1520c(c)(1).  Specifically, the ALJ noted various treatment notes
indicating that Kauer's mood was stable, he presented normally, slept well, ate well, and had a
few depressive days a month.  Id.  The ALJ further relied on nonmedical information from Dr.
Saul's treatment notes, such as Kauer attending dog obedience classes, Kauer visiting his
parents, and taking retirement classes.  Id.  Thus, substantial evidence supports the ALJ's
conclusion that Dr. Saul's opinion is not supported by the objective medical evidence.

The ALJ also found Dr. Saul's opinion inconsistent with the record.  R. 29-30; 20 C.F.R.
§ 404.1520c(c)(2); Cota, 2022 U.S. Dist. LEXIS 153505, at *15.  Kauer's earning records, Dr.
Saul's treatment notes, and Kauer's activities did not support Dr. Saul's conclusions.  R. 29-30.

19

The ALJ specifically noted that Dr. Saul's opinion of extreme limitations stemming back to 2003 was inconsistent with the earning statements indicating that Kauer was gainfully employed at the time of his extreme limitations.  Id.  During the time Dr. Saul alleged Kauer experienced extreme limitations, evidence shows Kauer was not as limited as Dr. Saul suggested.  R. 398-423; 687-90. Kauer was in a good mood, interviewed with various employers, took retirement classes, and visited his parents.  Id.  The ALJ was within his authority to find Dr. Saul's opinion unpersuasive, because it was not consistent with the record as a whole.  See Cota, 2022 U.S. Dist. LEXIS 153505, at *15; 20 C.F.R. § 404.1520c(c)(2).

Kauer also asserts that the ALJ failed to consider Dr. Saul's explanations in support of her opinion.  Doc. 10, at 18.  The ALJ is not required to evaluate the persuasiveness of every piece of evidence.[11]  Further, Dr. Saul's explanations do not support Kauer's assertion that his symptoms and limitations "waxed and waned" since March 2003.  Doc. 10, at 23.  Dr. Saul's Treating Source Statement/Medical Assessment Addendum represented that Kauer's mental health and resulting functional limitations varied greatly during his time treating with her but did not provide that his symptoms waxed and waned as Kauer claimed.  R. 834; Doc. 10, at 23.  Dr. Saul does not describe Kauer's bipolar symptoms from the date of alleged disability until the date last insured.[12]  R. 834.  Without an explanation of symptoms for the relevant disability period, the ALJ appropriately reviewed and cited to Dr. Saul's treatment notes concluding,

_____

[11] See also Hur v. Barnhart, 94 F. App'x 130, 133 (3d Cir. 2004) ("The ALJ is not required to explicitly discuss every piece of evidence."); Phillips v. Barnhart, 91 F. App'x 775, 780 n.7 (3d Cir. 2004) (citation omitted) ("A written evaluation of every piece of evidence is not required, as long as the ALJ articulates at some minimum level her analysis of a particular line of evidence. Moreover, the ALJ's mere failure to cite specific evidence does not establish that the ALJ failed to consider it.").
[12] Dr. Saul's Medical Assessment Addendum, dated November 25, 2019, indicates that Kauer's alleged current worsened symptoms occurred after the date last insured.  R. 834.

generally, that Kauer was social, slept okay, was not depressed (but had three days of depression), and was overall in a good mood and was stable. R. 30. Therefore, the ALJ's failure to explicitly discuss Dr. Saul's Treating Source Statement/Medical Assessment Addendum does not constitute a reversible error.

Lastly, Kauer asserts that the ALJ erroneously focused exclusively on the "results of … mental status examinations" contained in Dr. Saul's treatment records and substituted his lay opinion for Dr. Saul's explanations.[13] Doc. 10, at 21. Kauer argues that under 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00C(2) the ALJ was required to consider more than just, "results of… mental status examinations" from his medical sources. Id. Contrary to Kauer's assertions, of the eleven possible forms of evidence to consider, the ALJ considered eight. 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00C(2)(a)-(l). The ALJ considered subjective symptom testimony (R. 26; 28), medical and psychiatric history (R. 26), Kauer's bipolar disorder and essential tremors diagnoses (R. 25-30), Kauer's medications (R. 29), the beneficial effects of treatment (R. 29), medication side effects (R. 38), and presentation during his exams (R. 28).[14] Thus, the ALJ considered various forms of evidence supported by the medical and nonmedical record. Kauer's claim that the ALJ erred in failing to consider multiple forms of evidence set forth in 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00C(2)(a)-(l) is unsupported.

Because substantial evidence supports the ALJ's evaluation of Dr. Saul's medical opinion, I find the ALJ did not err in finding Dr. Saul's medical opinion unpersuasive.

---

[13] Brown v. Astrue, 649 F.3d 193, 196 (3d Cir. 2011) (citation omitted) ("[T]he ALJ is entitled to weigh all evidence in making its finding . . . [and] is not bound to accept the opinion or theory of any medical expert, but may weigh the medical evidence and draw its own inferences.").
[14] See 20 C.F.R. pt. 404, subpt. P, app. 1, § 12.00C(2)(a)-(l)

**C.  The ALJ Sufficiently Considered the Lay Witness Testimony of Kauer's Wife, Susanne Satterly.**

Kauer asserts that the ALJ failed to assess the consistency or credibility of Mrs. Satterly's testimony.  Doc. 10 at 28.  Kauer also asserts that the ALJ failed to explain why he rejected her testimony.  Id.

Testimony from "[f]amily members, caregivers, friends, neighbors, employers, and clergy" is classified as a nonmedical source of evidence.  See 20 C.F.R. §§ 404.1502(e)(4), 416.929(c)(1).  ALJs are not required to articulate how they consider evidence from nonmedical sources using the supportability and consistency requirements.  See 20 C.F.R. § 416.920c(d).  Nonetheless, the ALJ must specifically identify and explain what evidence he found not credible and why he found the evidence not credible.  Adorno v. Shalala, 40 F.3d 43, 48 (3d Cir. 1994) (citing Stewart v. Sec'y of Health, Educ. & Welfare, 714 F.2d 287, 290 (3d Cir. 1983)); see also Stout v. Comm'r, 454 F.3d 1050, 1054 (9th Cir. 2006) (stating that an ALJ is required to provide "specific reasons for rejecting lay testimony").  Moreover, an ALJ cannot reject evidence for an incorrect or unsupported reason.  Ray v. Astrue, 649 F. Supp. 2d 391, 402 (E.D. Pa. 2009) (quoting Mason, 994 F.2d at 1066).

Here, Kauer incorrectly asserts that the ALJ was required to assess the consistency of Mrs. Satterly's testimony.  The applicable regulation, 20 C.F.R. § 416.920c(d), contains no such requirement.

The ALJ is, however, required to provide a reason or explanation why he or she finds evidence not credible.  This requirement does not apply to Mrs. Satterly's testimony since the ALJ did not reject her testimony.  The ALJ accepted Mrs. Satterly's testimony as follows:

> According to his wife, he has tremors, which limit his abilities to perform activities of daily living.  She also reports that he has difficulty concentrating and handling stress (Witness testimony).  After careful consideration of the evidence, **the undersigned finds**

> **that the claimant's medically determinable impairments could
> reasonably be expected to cause the alleged symptoms**; however,
> the claimant's statements concerning the intensity, persistence and
> limiting effects of these symptoms are not entirely consistent with
> the medical evidence and other evidence in the record for the reasons
> explained in this decision.

R. 28 (emphasis added).  At no time does the ALJ reject Mrs. Satterly's testimony as Kauer

contends.  Instead, the ALJ found inconsistency in Kauer's reported intensity, persistence and

limiting effects.  Id.  Ultimately, the ALJ considered Mrs. Satterly's testimony regarding Kauer's

tremors and bipolar symptoms when crafting the RFC.  Therefore, the Court finds no error in the

ALJ's treatment of Mrs. Satterly's testimony.

### D.  Sufficient Evidence Supports the Functional Limitations the ALJ Adopted and Included in Kauer's RFC and in the Hypothetical Questions to the Vocational Expert.

Kauer's final claim is that "the ALJ improperly rejected the well-supported opinions of

treating psychiatrist Dr. Saul and examining psychologist Dr. Patrone and failed to include the

limitations they assessed in the RFC and the hypothetical he presented to the Vocational Expert."

Doc. 10, at 29.

An RFC assessment is the most a claimant can do in a work setting despite the limitations

caused by his or her impairments.  20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The RFC is

based on all the relevant evidence in a case record—medical and nonmedical.  20 C.F.R. §§

404.1545(a)(3), 416.945(a)(1), (a)(3).  It is the exclusive responsibility of the ALJ to determine

the claimant's RFC.  20 C.F.R. §§ 404.1546(c), 416.946(c).  A VE or specialist may offer an

expert opinion in response to a hypothetical question posed to him or her about the claimant's

physical and mental limitations and their effects on the claimant's ability to perform previous

work or participate in jobs in the national economy.  20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2).

An ALJ is required to include in the RFC any credibly established limitations supported by the

record.  Salles v. Comm'r of Soc. Sec., 229 F. App'x 140, 147 (3d Cir. 2007).  Relatedly, a hypothetical question to the VE must include all the functional limitations the record supports and an ALJ adopts.  See Chrupcala v. Heckler, 829 F.2d 1269, 1276 (3d Cir. 1987); Ramirez v. Barnhart, 372 F.3d 546, 554-55 (3d Cir. 2004); Rutherford v. Barnhart, 339 F.3d 546, 554 (3d Cir. 2005).

        Here, the ALJ did not adopt Dr. Saul and Dr. Patrone's limitations because he found a lack of evidence in the record supporting their opinions.  R. 29-30.  Because the ALJ found Dr. Saul's testimony unpersuasive, the ALJ is not required to include Dr. Saul's proposed functional limitations in Kauer's RFC and in the hypothetical questions to the VE for consideration.  See supra Section A; see Salles, 229 F. App'x at 147.

        Kauer does not contest the ALJ's finding that Dr. Patrone's opinion was unpersuasive. Notably, Dr. Patrone concluded that Kauer had no functional limitations in understanding, remembering, or carrying out instructions, but he had moderate limitations in dealing with coworkers, supervisors, and the public.  R. 30; 858-59.  Dr. Patrone additionally found that Kauer suffered marked limitation in responding to usual work situations and changes in routine work setting.  R. 30; 859.  The ALJ found Dr. Patrone's opinion unpersuasive, citing to the lack of evidence in the record supporting his conclusion of marked limitations.  R. 30.  The ALJ was not required to include Dr. Patrone's proposed functional limitations in the RFC determination and hypothetical questions to the VE because the ALJ found Dr. Patrone's opinion was unsupported by the evidence.[15]

_____

[15] I note the ALJ utilized similar limitations to those proposed by Dr. Saul and Dr. Patrone when crafting Kauer's RFC.  The inclusion of these additional limitations exceeded the medically credible limitations the ALJ found.  The ALJ was well within his right to include these limitations in Kauer's RFC.  See Titterington v. Barnhart, 174 F. App'x 6, 11 (3d Cir. 2006)

Accordingly, Kauer's claims regarding error in the ALJ's RFC determination and hypothetical to the VE lack merit.  The Court finds no error.

**VI.**      **CONCLUSION**

Kauer's claims lack merit.  First, substantial evidence supports the ALJ's decision discounting the severity of Kauer's symptoms.  Second, the ALJ's finding that Dr. Saul's opinion was unpersuasive is also supported by substantial evidence.  Third, the ALJ appropriately considered Mrs. Satterly's testimony.  Finally, the ALJ did not err when crafting Kauer's RFC nor did he err in his hypothetical questions to the VE.

Accordingly, Kauer's request for review is **DENIED**, and the Commissioner's decision is **AFFIRMED**.

BY THE COURT:


  /s/ Craig M. Straw_____
CRAIG M. STRAW, U.S.M.J.

---

(providing there is no legal requirement the ALJ adopt particular findings in the course of determining an RFC and it is duty of ALJ to survey all medical evidence to craft an RFC).